IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BENITEC AUSTRALIA LTD.,                :
                                       :
          Plaintiff,                   :
                                       :
     v.                                : Civil Action No. 04-889 JJF
                                       :
PROMEGA CORPORATION,                   :
                                       :
          Defendant,                   :
                                       :
     v.                                :
                                       :
COMMONWEALTH SCIENTIFIC AND            :
INDUSTRIAL RESEARCH ORGANISATION,      :
                                       :
          Third Party Defendant.       :
_____

John W. Shaw, Esquire and Kevin Baird, Esquire, of YOUNG CONAWAY
STARGATT & TAYLOR, LLP, Wilmington, Delaware.
Of Counsel: John P. Corrado, Esquire, Barry E. Bretschneider,
Esquire, Charles C. Carson, Esquire, of MORRISON & FOERSTER LLP,
McLean, Virginia.
Attorneys for Plaintiff.

Michael F. Bonkowski, Esquire, and Kimberly L. Gattuso, Esquire,
of SAUL EWING, Wilmington, Delaware.
Of Counsel: Grant C. Killoran, Esquire and Mary C. Turke, Esquire
of MICHAEL BEST & FRIEDRICH LLP, Milwaukee, Wisconsin.
Attorneys for Defendant.

John W. Shaw, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP,
Wilmington, Delaware.
Attorney for Third Party Defendant.
_____

**O P I N I O N**

March 8, 2005
Wilmington, Delaware

FARNAN, District Judge

Presently before the Court is the Motion For A Preliminary Injunction (D.I. 26) filed by Defendant Promega Corporation ("Promega"). For the reasons set forth below, the Court will deny the Motion For A Preliminary Injunction (D.I. 26).

BACKGROUND

## I. Procedural History

Benitec is an Australian corporation that develops therapeutics to treat serious diseases using DNA-directed RNA interference ("ddRNAi"). Promega is a Wisconsin corporation that develops and markets biotechnology research products. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

On July 22, 2004, Plaintiff Benitec Australia, Ltd. ("Benitec") brought this declaratory action against Promega Corporation ("Promega") alleging that Promega has improperly withheld certain sums from payments due to Benitec under a license agreement and that, as a result, Promega's license has been converted to a non-exclusive license. Benitec further alleges that any sublicenses granted by Promega have been transferred to Benitec as of May 1, 2004, along with the right to receive all future sublease income from the sublicenses.

On August 25, 2004, Promega served its Answer, Affirmative Defenses, Counterclaims (D.I. 6) and Third Party Complaint (D.I. 4). On September 17, 2004, Benitec and Third Party Defendant Ambion, Inc. ("Ambion") each filed Answers (D.I. 10, 13) and moved

for judgment on the pleadings (D.I. 11, 14). Those motions are fully briefed and awaiting decision by the Court.

On November 10, 2004, Promega brought this Motion for a Preliminary Injunction (D.I. 26) to preserve its rights as an exclusive licensee during the pendency of this lawsuit.

## II. The License Agreements

On March 31, 2003, Benitec and Promega executed a "Benitec/Promega License Agreement for RNAi Technology" ("the Benitec license"). The license gave Promega the exclusive worldwide right to commercially develop, sell, and distribute ddRNAi products for use in research, and the exclusive right to grant sublicenses. Key provisions of the Benitec license state that Promega had to pay an upfront license fee of $350,000, a $50,000 UK patent fee, and a $100,000 European patent fee. Further, assuming that the license was still exclusive, Promega had to pay an annual minimum royalty of $50,000 no later than April 30th of each year. If Promega failed to timely pay the annual minimum royalty, the license would convert to non-exclusive status and Promega would lose its right to sublicense products. Upon conversion to a non-exclusive license, Promega would be required to assign all existing product sublicenses to Benitec and immediately pay all outstanding minimum royalty payments. (D.I. 32, App. A at ¶¶ 4.00, 4.01, 5.00, 5.01, and 7.00.) The Benitec license also provided that Promega would be liable for all taxes arising out of license payments other than "taxes imposed on Benitec's net

3

income."  (Id. at ¶ 7.04.)  Further, the Benitec license allowed
Promega and Benitec to jointly grant commercial research licenses.
(Id. at ¶ 7.03.)

On or about March 31, 2003, Promega paid Benitec the $350,000
initial license fee.  At some subsequent date, Promega satisfied
the $50,000 UK patent issuance fee obligation.

On December 8, 2003, Benitec, Promega, and Commonwealth
Scientific and Industrial Research Organization ("Commonwealth")
executed a license ("the License"), which superseded the Benitec
license.  The provisions discussed above remained the same, except
that § 4.00 of the license, which previously required payment of
three license fees (initial $350,000, UK $50,000 and European
$100,000) was changed to require only the $100,000 European patent
issuance fee.

On May 26, 2004, ¶ 7.00 of the license was amended to define
the effective date of the license was March 31, 2004 ("the
Amendment").

## III. The Tax Payments

At the time that Promega paid Benitec the $350,000 initial
license fee, it also made a 10% U.S. income tax payment of $35,000
on Benitec's behalf pursuant to a U.S.-Australia tax treaty.
Promega alleges that it did so because Benitec at that time had no
U.S. place of business.  Promega further alleges that under the
License, Benitec was liable for its own income taxes, and,
therefore, owed Promega $35,000.  Benitec contends that Promega was

4

responsible for making the U.S. income tax payment pursuant to the terms of the contract. On April 28, 2004, as its annual royalty payment, Promega paid Benitec $9,719, which included a setoff of $2,500 in taxes related to this royalty[1] and a setoff of the $35,000 prior tax payment plus 10% interest.

On July 22, 2004, Benitec sent Promega a letter alleging that Promega's rights under the Benitec/Commonwealth license had become non-exclusive as of May 1, 2004. Benitec cited Promega's alleged failure to pay the annual minimum royalty due on April 30, 2004, as the reason for the conversion. Benitec filed this lawsuit against Promega shortly thereafter.

The primary issue in this lawsuit is whether Benitec rightly declared that the license had converted to non-exclusive status because Promega failed to make the minimum annual royalty payment for the 2004 fiscal year.

In support of the instant Motion, Promega contends that while this lawsuit for declaratory judgment as to Promega's status as a licensee is pending, Benitec is issuing product sublicenses and unilaterally granted a commercial research license in violation of Promega's exclusive product licensing rights.

### DISCUSSION

In determining whether to grant a motion for a preliminary injunction, courts are to consider (1) whether the movant has shown

---

[1]The treaty tax rate for withholding between the United States and Australia was 5% effective July 1, 2003.

a reasonable probability of success on the merits, (2) whether the movant will be irreparably injured by denial of the relief, (3) whether granting preliminary relief will result in even greater harm to the nonmoving party, and (4) whether granting the preliminary relief will be in the public interest.  Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153 (3d Cir. 1999).

## I. Likelihood of Success on the Merits

First, the party seeking a preliminary injunction must demonstrate a likelihood of success on the merits.

Promega contends that it has shown a likelihood of success on the merits.  Promega first argues that it will prevail on its breach of contract counterclaim because the May 26, 2004, Amendment to the license confirms that Benitec was liable for the treaty taxes.  Specifically, Promega contends that because the May 26, 2004, Amendment to ¶ 7.00 of the License applies only to the minimum royalty payments, it follows that, on May 1, 2004, Promega could not have become a non-exclusive licensee with no obligation for future minimum royalty payments.  Thus, Promega asserts that Benitec's willingness to amend the License after Promega withheld the taxes from the April 2004 royalty payment proves that Benitec considered the taxes withheld "taxes imposed on . . . net income" as set forth in ¶ 7.04.  In response, Benitec contends that the purpose of the Amendment was to correct a clerical error.

Promega further contends that evidence of communications between Benitec and Promega executives confirms that Benitec was

6

liable for the treaty taxes.  Specifically, Promega contends that John McKinley, Benitec's CEO, told Richard Schiffreen, Promega's Director of Technology and Development, that Promega was not liable for Benitec's taxes.  As evidence of Mr. McKinley's statement, Promega offers Dr. Schiffreen's contemporaneous notes of the conversation and an email from Mr. McKinley to Dr. Schiffreen dated June 22, 2003.  Promega contends that, subsequent to the executives' conversation, Promega wired $47,500 to Benitec in satisfaction of the $50,000 UK patent issuance fee less $2,500 in income taxes that Promega had paid on Benitec's behalf.  Promega alleges that Benitec accepted Promega's wire transfer of $47,500 without objection.

Promega also argues that even if Benitec did comply with the terms of the agreement in converting the License to non-exclusive status, Benitec's behavior leading up to and following the alleged automatic conversion constitutes a breach of the implied duties of good faith, fair dealing, and cooperation.  Alternatively, Promega contends that Benitec's actions establish an accord and satisfaction.  Finally, Promega contends that Benitec is equitably estopped from declaring Promega's license to be non-exclusive.

In response, Benitec contends that Promega's declarations and exhibits demonstrate an absence of evidentiary support for Promega's allegations.  Further, Benitec contends that the four corners of the license contain clear and unambiguous contract language.  In support of its position that the tax deductions in

question were based on Benitec's gross income, Benitec offers the language of relevant tax statutes, treasury regulations, and treaties.  Benitec further contends that is has not breached its duties of good faith and fair dealing, and that there was no accord and satisfaction.

After reviewing the contentions of the parties, the relevant facts, and the applicable law, the Court concludes that Promega has not shown a likelihood of success on the merits.

A. Breach of Contract Claim

The Court finds that Promega has not shown a likelihood of success on the merits of its breach of contract claim.  Section 7.04 of the License states that Promega as licensee shall pay and indemnify Benitec as licensor all taxes based on payments under the License other than those imposed or based on Benitec's net income.  Section 7.04 goes on to state that all amounts payable by Promega shall be paid without deduction or withholding of any present or future tax, and that Benitec shall receive amounts equal to the amounts it would have received had not such deductions or withholding been required.  Benitec contends that the $35,000 and $2,500 tax treaty payments that Promega withheld from its annual royalty payment were based on gross income, not net income, and, therefore, under ¶ 7.04 of the license, those payments were not attributable to Benitec.  In support of its position, Benitec offers Treasury Regulation § 1.881-2(a)(2), Treasury Regulation § 1.1441-3(a) and U.S.-Australian Tax Treaty Article 12.  Promega concedes

that the income taxes at issue are technically levied on gross income, but asserts that gross income in this context is the same as net income because no deductions are allowable.  Promega cites 26 C.F.R. § 1.881-2(a)(3) in support of this assertion.

The Court finds that the contract language is clear and unambiguous that Promega cannot withhold sums for tax payments unless based on Benitec's net income.  At this point in the proceedings, the Court finds that Promega has not brought forth convincing evidence that the taxes in question were based on Benitec's net income.  Thus, the Court finds that Section 7.04 is a "gross-up" provision that increases the amount of a royalty to compensate the licensor for the taxes withheld.  The Court does not doubt that executives of Promega and Benitec discussed Promega's ability to recoup these payments at some point in the future.  However, Promega's unilateral action in withholding the amount of the taxes from its minimum royalty payment appears to have had the effect of breaching the License.

Thus, the Court concludes that Promega has not shown a likelihood of success on the merits with regard to its breach of contract claim.

B. <u>Breach of Implied Warranty of Good Faith and Fair Dealing</u>

Delaware courts recognize an implied covenant in contracts requiring the parties to act with good faith toward each other with respect to their contract.  <u>Katz v. Oak Indus. Inc.</u>, 508 A.2d 873, 880 (Del. Ch. 1986) (citing Restatement (Second) of Contracts, § 205

(1981)).  A party must "act reasonably to fulfill the intent of the parties to the agreement."  Gloucester Holding Corp. v. U.S. Tape & Sticky Prod., LLC, 832 A.2d 116, 128 (Del. Ch. 2003) (quoting Kelly v. McKesson HBOC, Inc., 2002 WL 88939 at * 10 (Del. Super. Jan. 17, 2002)).

Delaware courts have used the following test when assessing whether the implied covenant has been breached: "is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith--had they thought to negotiate with respect to that matter." Katz, 508 A.2d at 880 (citing Martin v. Star Publ'g Co., 126 A.2d 238 (Del. Supr. 1956);  Danby v. Osteopathic Hosp. Ass'n., 101 A.2d 308 (Del. Ch. 1953) aff'd 104 A.2d 903 (Del. Supr. 1954); Broad v. Rockwell Int'l Corp., 642 F.2d 929, 957 (5th Cir. 1981)).  However, "[t]he implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract."  Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912, 921 (Del. Ch. 1999)  (citing Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co., 708 A.2d 989, 990 (Del. Supr. 1998)).

Promega contends that even if Benitec's construction of the License is correct, Benitec's silence and subsequent assertion that the License converted to non-exclusive status is a breach of the implied covenant of good faith and fair dealing.  The Court finds

that Promega is attempting to inject a new obligation into the contract, the obligation to warn the other party if any of its intended actions will breach the contract.  The Court finds that the conditions for breach are expressly stated in the contract, and that the parties would not necessarily have agreed to the additional duty to warn that Promega requests.

Thus, the Court concludes that Promega has not shown a likelihood of success on the merits of its breach of implied warranty of good faith and fair dealing claim.

C. <u>Accord and Satisfaction</u>

The required elements for an accord and satisfaction in Delaware are that (1) a bona fide dispute among the parties as to the amount of the debt must honestly exist, (2) the debtor tendered an amount to the creditor in honest belief that such would constitute satisfaction of the debt, and (3) the creditor accepts such payment.  <u>See</u> <u>Acierno v. Worthy Bros. Pipeline Corp.</u>, 693 A.2d 1066, 1068-69 (Del. 1997); <u>CitiSteel USA, Inc. v. Connell Ltd. P'ship</u>, 758 A.2d 928 (Del. 2000).  An accord and satisfaction may not result from part payment of a liquidated claim in the absence of additional consideration.  AMJUR ACCORD §§ 7,28; <u>See</u>, <u>e.g.</u>, <u>Trader v. Wilson</u>, 2002 WL 499888, *3-4 (Del. Super.).  A liquidated claim is one which can be determined with exactness from the agreement between the parties, by an arithmetical process, or by the application of definite rules of law.  <u>State, for Use of Warner Co. v. Mass. Bonding & Ins. Co.</u>, 9 A.2d 77, 80 (Del. Super. 1939); AMJUR

11

ACCORD §7.

The Court finds that the $50,000 annual royalty payment owed by Promega was liquidated because it can be "determined with exactness from the agreement between the parties." AMJUR ACCORD §7. Sections 5.00 and 7.00 of the License expressly stipulate that Promega must pay a minimum annual royalty of $50,000 no later than April 30th of each year. Thus, the Court concludes that the amount of Promega's payment was liquidated and that Promega's partial payment of it cannot, therefore, constitute an accord and satisfaction.

    D. <u>Equitable Estoppel</u>

Under Delaware law, the doctrine of equitable estoppel may be invoked "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." <u>Waggoner v. Laster</u>, 581 A.2d 1127, 1136 (Del. 1990). The party claiming estoppel must show that (1) he lacked the knowledge of the true facts or he lacked the means to obtain the truth; (2) he relied on the conduct of the party against whom the estoppel is claimed; and (3) he suffered a prejudicial change of position as a result of his reliance. <u>Id.</u> at 1136. The party seeking estoppel must be able to prove these elements by clear and convincing evidence. <u>Reeder v. Sanford School, Inc.</u>, 397 A.2d 139 (Del. Super. 1979).

To support its claim of equitable estoppel, Promega relies on oral statements that allegedly modified the terms of the written

12

agreement between the parties.  Delaware courts generally reject attempts to invoke equitable estoppel based on such oral statements. See, e.g., Keene Corp. v. Hoofe, 267 A.2d 618 (Del. Ch. 1970). In Keene, the defendant agreed in writing to accept stock options subject to restrictions providing for repurchase by his employer if his employment terminated before defendant was employed five years. The court in Keene held that, even though the defendant allegedly relied to his detriment on inducements to negotiate the terms of his employment, he did not act with reasonable diligence in discovering the restrictions and when employment was terminated in less than one year, the employer was not estopped from its asserting right to repurchase the stock.

Thus, the Court concludes that Promega cannot now be allowed to claim detrimental reliance when it had knowledge of the terms of the contract from the contract itself.

## II.   Irreparable harm

The Court must next consider whether Plaintiffs will suffer irreparable harm if the injunctive relief is not granted.

Promega contends that Benitec's sublicensing activities will cause harm to Promega's position in the RNAi market and that Promega will suffer the costs of lost opportunity.  Promega further contends that its damages are complex and that any judgment may be uncollectible from Benitec.  Promega argues that it is entitled to a presumption of irreparable harm because the right to exclude is at issue in this lawsuit.

13

In response, Benitec contends that Promega cannot show irreparable harm because Promega has delayed in seeking preliminary relief and because Promega's alleged harms are purely speculative and Promega has provided no objective evidence or expert opinion on market conditions.

Although a delay in seeking relief may constitute grounds for barring preliminary relief, in the instant case, the Court does not agree that Promega has delayed in filing for a preliminary injunction.  Promega filed for preliminary injunctive relief shortly after it became apparent that Benitec was negotiating directly with potential sublicensees.  However, where, as here, interests involving money damages are at stake, preliminary injunctive relief is not usually appropriate.  See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801-02 (3d Cir. 1989)(harm was not deemed irreparable even though nature of the action involved lose of majority of business revenue).  The Court finds that Promega has not shown that the non-economic injuries it alleges, such as of control of reputation, loss of trade and loss of goodwill, are reasonably imminent or otherwise non-speculative.

For these reasons, the Court concludes that Promega has not made a sufficient showing of irreparable harm to allow the Court to find that this factor weighs in favor of granting a preliminary injunction in this lawsuit.

## III. Balance of Hardships

Next, the Court must balance the harm that will occur to

Plaintiffs if the injunction is denied with the harm Defendants will incur if the injunction is granted. <u>Clean Ocean Action v. York</u>, 57 F.3d 328, 331 (3d Cir. 1995).

Promega contends that the balance of hardships favors it because enjoining Benitec's sublicensing activity will not harm Benitec. Rather, Benitec would be in the same position it was in before the breach. In support of this argument, Promega points to the $350,000 initial license fee it paid to Benitec. In response, Benitec contends that the balance of harms favors Benitec because the new sublicenses represent a source of revenue for it.

The Court finds that granting the Motion for Preliminary Injunction will cause Benitec only minimal hardship because doing so will leave Benitec in the same position it was shortly before the injunction was granted, i.e., not granting sublicenses and in receipt of the $350,000 initial license fee. Further, the Court finds that allowing Benitec to continue its sublicensing efforts in the ddRNAi market may cause Promega to lose revenue, market share and good will in the marketplace that it may find difficult to recover should it prevail on the merits in this action. For these reasons, the Court concludes that the balance of hardships tips in Promega's favor.

## IV. Public interest

Finally, the Court must assess the impact of an injunction in Promega's favor on public interest concerns.

Promega contends that an injunction in these circumstances will

not harm the public because Benitec was a party to an exclusive
licensing agreement and received a hefty licensing fee.
Promega further contends that, in the absence of injunctive relief,
those seeking to license the ddRNAi technology will be confused as
to whether to deal with Benitec or Promega and may decide to delay
licensing or withdraw from the market entirely.  Benitec responds
that an injunction would end all sublicensing and would deprive the
public of access to Benitec's technology.

     While this is a private contractual dispute that has no
substantial public impact, the Court finds that the public interest
weighs in favor of enforcing a contract that has been shown to be
valid at this preliminary juncture.  For this reason, the Court
concludes that granting a preliminary injunction in the instant case
will not have a favorable impact on the public interest.

**CONCLUSION**

     In sum, the Court concludes that Promega's failure to
demonstrate likelihood of success on the merits and irreparable harm,
and the impact on the public interest weigh against issuing a
preliminary injunction.  Thus, the Court concludes that a preliminary
injunction should not issue.  Accordingly, the Court will deny
Defendant Promega's Motion For A Preliminary Injunction (D.I. 26).

     An appropriate Order will be entered.